J-S07016-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: T.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2460 EDA 2022 |

Appeal from the Order Entered September 14, 2022,
in the Court of Common Pleas of Philadelphia County,
Juvenile Division at No(s):  CP-51-DP-0000806-2018.

| | | |
|---|---|---|
| IN THE INTEREST OF: C.C.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2461 EDA 2022 |

Appeal from the Decree Entered September 14, 2022,
in the Court of Common Pleas of Philadelphia County,
Juvenile Division at No(s):  CP-51-AP-0000758-2021.

| | | |
|---|---|---|
| IN THE INTEREST OF: C.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: T.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2462 EDA 2022 |

Appeal from the Order Entered September 14, 2022,
in the Court of Common Pleas of Philadelphia County,
Juvenile Division at No(s): CP-51-DP-0001237-2019.

| | | |
|---|---|---|
| IN THE INTEREST OF: C.T.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: T.P., FATHER | : | |
| | : | |
| | : | No. 2463 EDA 2022 |

Appeal from the Decree Entered September 14, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000759-2021

BEFORE: DUBOW, J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY KUNSELMAN, J.: **FILED APRIL 17, 2023**

T.P. (Father) appeals the decrees issued by the Philadelphia County Court of Common Pleas, which terminated his rights to his five-year-old son, C.C.P., and his four-year-old daughter, C.T.P. (the Children), pursuant to the Adoption Act. **See** 25 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), (b). Father also challenges the trial court's decision to change the goal of the Children's respective dependency cases, from reunification to adoption.[1] After review, we affirm the termination decrees and dismiss Father's goal change appeals as moot.

_____

[1] The trial court also terminated the rights of M.B. (Mother) and likewise issued goal change orders. **See** 2512, 2513, 2514, and 2515 EDA 2022. Mother's appeal is separately listed before this panel.

- 2 -

In its opinion filed pursuant to Pa.R.A.P. 1925(a), the trial court thoroughly set forth the following factual and procedural history:

[…] DHS first became aware of this family on February 27, 2016, when it received a general protective services (GPS) report indicating concerns for the safety of the Children's older sibling and parent's drug activity. The report indicated concerns for the older sibling's hygiene and food intake, Mother's use and abuse of Xanax and Percocet, and the family's living conditions. Based on this report, Community Umbrella Agency (CUA) Tabor Community Partner services were implemented in-home for the family until October 16, 2017, when it was determined that the family was stabilized.

[In March 2018], following the birth of C.C.P., DHS received a GPS report which alleged Mother tested positive for benzodiazepine, marijuana and opiates at the birth of C.C.P. C.C.P. also tested positive for benzodiazepine and marijuana at birth. Mother was not prescribed the medication and admitted to taking Xanax, Percocet and marijuana every other day. Mother also admitted that she last used drugs […] two days prior to the birth of C.C.P. When Father was present at the hospital, the room smelled of marijuana and he appeared under the influence of drugs and/or alcohol. Father was walking unsteadily, falling, slurring his words, and exhibiting inappropriate behavior. Following the birth of C.C.P., Father and Mother continued to visit the hospital under the influence of drugs and neither [was] engaged in drug and alcohol treatment. On April 8, 2018, DHS obtained an order of protective custody (OPC) for C.C.P. and placed him into the care of [Maternal Grandmother]. FN3

> FN3: C.C.P. was placed together with his older sibling at the [Maternal Grandmother's] home.

The adjudicatory hearing was held on April 19, 2018 whereby this court adjudicated C.C.P. dependent based on [the] present inability of parents to provide proper parental care and control, and C.C.P. was fully committed to DHS.

[In July 2019, C.T.P. was born.] [On the day of the birth], DHS received another GPS report stating that Mother had

- 3 -

given birth and tested positive for benzodiazepines, marijuana, and oxycodone. C.T.P. tested negative for those substances, however, C.T.P. was showing withdrawal symptoms which led to the hospital keeping C.T.P. for observations. Mother and Father appeared to be under the influence of drugs when they arrived at the hospital. They were unable to speak coherently, and Mother did not recall the date or year. A few days later, DHS spoke with Maternal Grandmother who stated that Mother was active in her drug use and not receiving treatment. [In July 2019], DHS obtained an OPC, and placed C.T.P. in care with [Maternal Grandmother]. The adjudicatory hearing was held on August 22, 2019 whereby this court adjudicated C.T.P. dependent based on the present inability of parents to provide parental care and control, and C.T.P. was fully committed to DHS.

Throughout the life of this case, Father's single case plan objectives have remained essentially the same. Father was referred to the Clinical Evaluation Unit (CEU) for a forthwith drug screen, an assessment, monitoring, and three random drug screens. He was also ordered to: 1) attend a substance abuse treatment program; 2) attend Achieving Reunification Center (ARC) or another agency for housing, employment assistance, and parenting education classes; 3) attend weekly supervised visits with the Children at the agency; and 4) attend a domestic violence counseling program. FN4

> FN 4: Domestic violence was added as an objective after Mother and Father engaged in a fight during a visit.

At the relevant goal change [and termination] hearing, the former CUA case manager supervisor, Tenessa Overton, testified that she had been the supervisor on the case from March of 2018 until January of 2020. She stated that Father was incarcerated twice over the course of her supervision. Father testified that he was incarcerated from on or about August 15, 2020 until December 4, 2020, and then against from on or about July 29, 2021 until May 28, 2022. FN5

> FN 5: On August 17, 2020, Father was arrested and charged with aggravated assault, strangulation, simple assault, reckless endangering another person, criminal trespassing, burglary, and two counts of criminal mischief. The complainant was Mother. On July 27,

- 4 -

2021, Father was arrested and charged with manufacture, delivery, or possession of a controlled substance with the intent to manufacture or deliver and intentional possession of a controlled substance by a person not registered. Father was incarcerated for approximately 412 days. Children are three years old and four years old, respectively.

Father further stated that he currently has an open criminal case for aggravated assault. FN6

> FN 6: Father testified that these charges relate back to August 15, 2020. He is currently in the trial phase.

Prior to his incarceration, Ms. Overton testified that Father only attended one drug screen in June of 2019 that came back positive for benzodiazepines and marijuana. CUA case manager, Sakeena Sidq, was assigned this case in January of 2022. She testified that Father completed the forthwith and two out of the three random drug screens. Those screens came back positive for marijuana and Father did not provide Ms. Sidq with a medical marijuana card. Ms. Overton testified that Father was inconsistent with his drug and alcohol treatment. Ms. Sidq futher testified that Father has been offered 25 out-patient sessions through Northeast Treatment (NET) Centers but attended only 13 sessions and missed 12. Two of the screens came back positive for only THC, one was negative, and then one was positive for THC and alcohol. Father continues his drug treatment at the NET.

Over the life of the case Father's housing situation has been inconsistent. FN7

> FN 7: Ms. Overton testified that throughout her time on the case, Father lived with different family members and never had a place of his own.

Ms. Sidq testified that Father completed ARC's housing program and was in the process of obtaining housing as recommended by ARC but currently lives with a family member. As for Father's employment objective, Father testified that he is employed through a temp agency called HireQuest. Ms. Sidq stated that she was able to verify Father's employment through his paystubs. Additionally, Ms. Sidq verified that Father was enrolled in ARC parenting

classes and only had two more classes to complete. As for Father's domestic violence component, Ms. Sidq testified that she was unaware if Father completed a program.

With regard to Father's visitation objective, Ms. Overton testified that visits never progressed passed supervised at the agency. She stated that there were domestic violence issues with the parents during a visit resulting in the separation of their visits. [Footnote omitted]. She further agreed that Father was consistent with visitation in-between his periods of incarceration. Father also testified that he called daily to speak with the Children while he was incarcerated. Ms. Sidq further elaborated on Father's visitation status since being released from prison and stated his visits are held weekly supervised at the agency for an hour. Father has been offered ten visits since his release and attended eight. Father testified that during the visits with the Children he engages with them through play and tries to teach them some fundamentals.

The CUA case manager also testified about the relationship and bond that the Children share with their pre-adoptive families. Ms. Sidq testified that C.C.P. has been in care now for his whole life for four and a half years since birth. C.C.P. looks at his Maternal Aunt as his mother and her husband as a father. C.T.P. has been in care for three years, since birth as well. Ms. Sidq stated that C.T.P. has been in her current placement for over 18 months. FN8.

> FN 8: C.T.P. has been in her current placement since March of 2021 with Paternal Cousin.

Ms. Sidq testified that C.T.P. looks to her Paternal Cousin as a mother. She further stated that C.T.P. has some attachment issues from being moved and not having a consistent caregiver or her biological parents since birth. The current kinship parents are willing to be adoptive resources for the Children. Additionally, Ms. Sidq testified that the Children would not suffer any harm from terminating Mother's and Father's parental rights and that she believes it is in the best interest of the Children to change the goal to adoption.

At the conclusion of the hearing, the Court issued a decree involuntarily terminating Father's parental rights and changing the permanency goal to adoption pursuant to 23

> Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and finding in accordance with 23 Pa.C.S.A. § 2511(b) that such termination best serves the developmental, physical, and emotional needs and welfare of the [Children].

Trial Court Opinion (T.C.O.), 12/14/22, at 1-6 (citations to the record and some footnotes omitted) (style adjusted).

Father timely filed this appeal. He presents the following issues for our review:

> 1. Did the trial court rule in error that DHS met its burden of proof warranting the termination of Father's parental rights?
>
> 2. Did the trial court rule in error that the termination of Father's rights would best serve the needs and welfare of the Children?
>
> 3. Did the trial court rule in error that the goal be changed to adoption?
>
> 4. Did the trial court rule in error that it was in the best interest of the Children to change the goal to adoption?

Father's Brief at 7 (cleaned up).

We begin with our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that

often have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial. ***In re Adoption of L.A.K.***, 265 A.3d 580, 597 (Pa. 2021); ***see also Interest of S.K.L.R.***, 265 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving…the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate could should not search the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." ***In re P.Z.***, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section

- 8 -

2511(b): determination of the needs and welfare of the child[.]

***In re C.M.K.***, 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting ***Matter of Adoption Charles E.D.M., II***, 708 A.2d 88, 91 (Pa. 1998)).

Critically, we may uphold a termination decision if any proper basis exists for the result reached. ***C.S.***, 761 A.2d at 1201. We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

We therefore review Father's appeal under Section 2511(a)(8) and (b), which provide:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> [...]
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> [...]

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

To terminate parental rights under Section 2511(a)(8), the petitioner must prove: (1) the child has been removed from parental care for 12 months or more from the date of the removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

With respect to any petition filed pursuant to subsection (a)(8), "the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b). Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused the placement, or the availability or efficacy of the services provided by the local children and youth agency. *K.Z.S.*, 946 A.2d at 759 (citation omitted).

In its Rule 1925(a) opinion, the trial court set forth its reasons for granting termination under this subsection:

> C.C.P. has been in care for over four years. C.T.P. has been in care for over three years. The Children were removed from Mother and Father's care due to substance abuse and the lack of appropriate housing. Since that time, Father was incarcerated for over a year and remained in minimal compliance for over three years. After being released from prison, Father began to comply with his single case plan objectives […] however, Father still lacks appropriate housing, continues to test positive on drug screens and has not engaged in a domestic violence program. Additionally, Father has an open criminal case that he is awaiting trial for aggravated assault charges. As a result, this Court is uncertain when Father will be able to remedy the conditions which led to the placement of his Children. The evidence clearly established that termination and adoption would be in the best interests of the welfare of the Children. They have a strong bond with their [respective pre-adoptive resources]. Thus, this court properly terminated Father's parental rights pursuant to [Section 2511(a)(8)].

T.C.O. at 12-13 (citations to the record omitted) (style adjusted).

In his Brief, Father maintains DHS failed to meet its burden. For support, he relies on our precedents confirming that incarceration, alone, will not result in termination. *See* Father's Brief at 29 (citing ***In re R.I.S***, 36 A.3d 567, 574 (Pa. 2011) ("We state emphatically that this Court has never adopted or countenanced a view that incarceration alone is *per se* evidence of parental incapacity or that it represents appropriate and sufficient grounds for the involuntary termination of parental rights.")). Father also cites the Adoption Act's prohibition against terminating parental rights based on "environmental factors such as inadequate housing, furnishings, income, clothing and medical

care if found to be beyond the control of the parent." *Id.* (citing 23 Pa.C.S.A. § 2511(b)). Finally, Father cites all the steps he has undertaken to satisfy his single case plan objectives, which include participation in parenting classes and drug treatment, applying for housing, and visiting the Children.

Upon review, we conclude Father's arguments merit no relief. The trial court did not terminate his rights solely because Father was incarcerated, faces incarceration again, or failed to secure appropriate housing. Rather, these were simply relevant factors in the court's overall Section 2511(a)(8) analysis, which inquires whether the conditions that led to removal continue to exist after 12 months. We cannot ignore the fact that the Children's dependency cases lasted three and four times as long as the statutory timeframe provides. And still, the conditions which led to the Children's removal continued to exist. Given the length of time the Children have been without Father's care, his current willingness or ability to remedy those conditions are no longer part of the termination analysis. Additionally, we observe the court's finding that Father has been minimally compliant throughout the history of this case, and that his single case plan remains largely unfulfilled.

In reaching our conclusion, we reiterate that it is not the function of this Court to search the record for evidence that would support a contrary result. *See S.K.L.R.*, 265 A.3d at 1124. "Not only are our trial judges observing the parties during the hearing, but usually, as in this case, they have presided over several other hearings with the same parties and have a longitudinal

understanding of the case and the best interests of the individual child involved[.]" *Id.* (quoting *R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)). Our role is simply to review the record for an abuse of discretion and for whether the evidence supports the trial court's conclusions. *Id.*

Having concluded that the trial court properly determined that DHS established the first two prongs of the Section 2511(a)(8) analysis, we must address the court's conclusions under the third element: whether termination best served the needs and welfare of the Children. This analysis is substantially similarly to the analysis under Section 2511(b). Therefore, we address Father's challenge to this element of the Section 2511(a)(8) analysis contemporaneously with his challenge to the court's determinations under Section 2511(b).

Both analyses consider "intangibles such as love, comfort, security, and stability." *In re I.J.*, 972 A.2d 5, 12 (Pa. Super. 2009) (citation omitted). The court "must also discern the nature and status of the parent-child bond, paying close attention to the effect of permanently severing the bond." *I.J.*, 972 A.2d at 12 (citation omitted). In performing a "best interests" analysis:

> The court should also consider the importance of continuity of relationships to the child, because severing close parental ties is usually extremely painful. The court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. Most importantly, adequate consideration must be given to the needs and welfare of the child.

*Id.* (citations omitted).

- 13 -

This Court has explained further:

> [S]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.,* 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Concerning the bond, the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship. *See C.M.K.*, 203 A.2d at 264 (citation omitted); *see also K.Z.S.*, 946 A.2d at 764 (holding there was no bond worth preserving where the child had been in foster care for most of the child's life, which caused the resulting bond to be too attenuated). Moreover, the court is not required to use expert testimony to resolve the bond analysis. *In re Z.P.*, 994 A.2d 1108, 1121 (citing *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008)).

"Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268. Finally, we emphasize that "[w]hile a parent's emotional bond with her and/or her child

- 14 -

is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted).

Here, we reiterate that the trial court determined that termination would best serve the Children's interest under Section 2511(a)(8), given their attachment to their pre-adoptive kinship caregivers. ***See*** T.C.O. at 13. In its analysis of Section 2511(b), the trial court expounded upon its conclusions:

> In the instant matter, this court determined the Children would not suffer irreparable harm if Father's parental rights were terminated. There was compelling testimony that the Children would not suffer harm if Father's parental rights were terminated and that the Children were significantly bonded with their kinship parents. Father has remained minimally compliant throughout the majority of this case and continues to lack appropriate housing to care for the Children. The testimony demonstrated that the Children's primary bond is with their pre-adoptive resources. Additionally, the testimony demonstrated that the Children's kinship resources meet all of their medical and emotional needs. In determining that termination would best serve the needs and welfare of the Children, this court considered that Father has not been able to meet the Children's emotional, physical, and developmental needs for over three years prior to the termination hearing.

T.C.O. at 14 (citations to the record omitted).

On appeal, Father argues that he maintained regular visitation with the Children. He also claims that DHS failed to supply sufficient evidence of a lack of bond between him and the Children. ***See*** Father's Brief at 31-33, 34-36. We reiterate that the lack of evidence of a bond between a parent and child,

- 15 -

allows a trial court to reasonably infer that no bond exists. **K.Z.S.**, 946 A.2d at 762-63. Upon review of the record, such an inference was reasonable in this case. Moreover, the bonding analysis is just one as aspect of the Section 2511(b) analysis. Father has been unable to meet the Children's needs and welfare for years. They have lived outside of his care for most of their lives. As a result, their primary attachments are to their respective pre-adoptive kinship parents. For these reasons, we discern no err or abuse of discretion with the court's determination that DHS met its burden under Section 2511(b).

In sum, we conclude that the trial court did not err or abuse its discretion when it granted the request of DHS to terminate Father's rights pursuant to Section 2511(a)(8) and (b). Father's first and second appellate issues are without merit. Father's remaining appellate issues concern the trial court's decision to change the goal of the dependency cases from reunification to adoption. Because we have concluded that termination was warranted, we dismiss these challenges as moot. **See Interest of D.R.W.**, 227 A.3d 905, 917 (Pa. Super. 2020) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.").

Decrees affirmed. Appeals concerning the goal change orders dismissed.

Judge King joins the memorandum.

Judge Dubow did not participate in the consideration or decision in this case.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>4/17/2023</u>